Case 1-3-4172, 1-3-4268, and 1-4-3352, William Howe et al. v. City of Akron Oral argument, 30 minutes per side. Mr. Sasse for the appellant, Carl Sappoli Good morning. May it please the court. My name is Ben Sasse. I represent the appellant, the City of Akron. I'd like to reserve seven minutes for rebuttal, Your Honor. Fine. For nearly seven years, the City of Akron has found itself unable to promote firefighters through its civil service system based on fatally flawed liability findings of disparate and reverse disparate impact. Those findings rest on evidence that cannot show that disparities in promotion rates for Caucasians, African Americans, and persons over 40 are due to discrimination and not random chance. And they have resulted in back pay and permanent injunctive relief wholly disproportionate to the unintentional discrimination a 2008 jury found. While I'm happy to answer questions on any of the issues presented in our briefs, I'd like to focus my argument here this morning on three issues. First, the insufficiency of the statistical evidence supporting the findings of disparate and reverse disparate impact. And before you begin to do that, I'd like to have you explain to me why that was not forfeited by virtue of not being appropriately argued in Howe 1. Sure, Your Honor. And I know the argument in the brief is that Howe 1 was only preliminary injunction. There was no final appealable order. Yet the opening brief starts right in to say, let's talk about the merits here. Right. That's my problem. So if you want to address the studies and why the statistical information is insufficient evidence for what the district court did, I'm wondering why that's being talked about now and wasn't handled earlier. Sure, Your Honor. And the forfeiture point, I think, is answered largely by this court's decision in Johnson, where, of course, Johnson had a similar situation. It went up on an appeal of a promotions order. In that case, likelihood of the merits was not addressed by the first panel, and yet in the second appeal in Johnson, the panel ruled on the merits. That's your argument, and I realize that's true, that the panel in Howe 1 did not struggle with that, but why weren't they struggling with it? It's because it wasn't raised. So what we raised in Howe 1 was we tried to use Grant as a hook, and we tried to focus the court on pure issues of law, saying that even under plaintiff's theory, and their theory, of course, is that you can rely solely on the Four-Fifths Rule, and I hope to get into that in a little bit, but even under plaintiff's theory, under what we viewed as settled circuit precedent, and that was the United Black Firefighters case, they were looking at the wrong metric as a matter of law. Did the District of Akron worry about the failure to raise this in Howe 1 and thereby be foreclosed in Howe 2? We didn't believe we were foreclosed, Your Honor, because we viewed that as an appeal. You didn't believe that we would be foreclosed. We would be foreclosed, correct, because we viewed that as an appeal. That's the question I need you to answer. Why not? Why aren't you foreclosed? I know what you were thinking, and you said you wanted to focus the court and you wanted to do all this, but my question really targets good thinking, but it has a detriment here. So here's the point, okay? We tried to get the order on post-trial motions that were not challenging before the court by asking the district court to certify it. The district court said no. All we could appeal at the time was the promotions order. We raised certain liability issues we thought we could raise in the context of an appeal of a promotions order then. The panel that decided this did not decide the merits. No, but what constrained you from raising all of this? There was no constraint, was there, to bring it forth, and even if the panel said we're not going to decide it? In theory, could we have argued, asked the court to review the entirety of the record? We could have. In practice, we did not ask the court to review the entirety of the record in the context of a preliminary injunction appeal. And I want to tell you why that's not forfeiture and it's not a waiver. And if you look, and I think the best, I think, you know, as we discussed, Johnson addresses it, but if you want to write on the issue, I'd commend to you the opinion in Pitt News that we cite in our briefs. And there the Third Circuit does a good job of marching through the analysis, and it says, quite frankly, that there is no law of the case or other constraints that arise from a ruling on a preliminary injunction unless the panel decides the merits. And I would agree with you, Judge Cook, if the panel had decided the merits, then we would be barred. But the panel did not decide the merits. And I think what I'm struggling with is it's simply wrong to conclude that the city can never appeal the underlying liability judgments, which is the necessary implication of saying, well, you have to raise every single issue you have now in the context of an abuse of discretion review or be foreclosed from ever arguing for a de novo standard of review in an appeal from a subsequent judgment. And so I think if you look at the way Johnson dealt with the issue, if you look at the opinion in Pitt News that we cite from the Third Circuit, if you look at the opinion in the A. Caperton case that we cite from the First Circuit, they all lead to the same conclusion. It's a matter of fundamental fairness. At some point, an appellant needs the ability, to challenge the issues of law it preserved before the trial court under the de novo standard of review that applies to an appeal from a judgment. And I don't want to have you, Terry, any longer on this. I think you've given me the answer that I'll investigate. Thank you. I appreciate your honor. And I guess just real quickly to foreshadow where I'm going, after we discuss the issues of the insufficient evidence, I do want to discuss the absence of any background circumstances evidence supporting the finding of adverse disparate impact. And I do want to discuss the absence of any findings by the district court that support the permanent injunction that is also on appeal. Now, if I could turn back for a moment to our issue with the statistical evidence before the court. We understand that statistical evidence can support a finding of disparate impact. To support an inference of discrimination, however, the statistical disparities identified must be significant. Otherwise, a member of a protected class has not shown that the disparities are due to discrimination as opposed to chance. And this requirement must be rigidly followed to avoid subjecting municipalities to liability based on nothing more than allegedly negligent testing by a third party. The cycles of promotion, there is one cycle of promotions at issue in this case, one cycle for lieutenants and one cycle for captains underlying the liability findings. That cycle comprised 2,004 promotional exams, 2,005 eligibility lists created from those promotional exams, and two years of promotions. There were 101 lieutenant candidates that started that process, and at the end of the day there were 28 promotions to lieutenant. There were 41 captain candidates that started that process, and at the end of the day there were 12 promotions to captain. And those promotions were not the plaintiff groups, right? The groups of people who are the plaintiffs here, those promotions were other people. None of the plaintiffs were promoted during that process, yes. In terms of protected groups, many of them, there were members of each group that was represented. Right, because you have to be one or another group. Right, exactly. So the statistics relating to these promotion cycles are set forth in Defendants Exhibits 1071 through 1078, and they appear in the appendix to our Motion for Judgment as a Matter of Law. And for a quick summary, you can look at Exhibit 1078, which is at page ID 7826. And what those statistics show uniformly across every element of each exam and every element of the promotion process is no significant disparities due to race or age with respect to lieutenant or due to age with respect to captain. And many of the tests, frankly, were performed by plaintiffs' own experts. So the question becomes, the only evidence they relied on in support of the liability judgment were violations of the Four-Fifths Rule as to promotions for lieutenant as to race and age and for captain as to race only. And the question becomes whether those findings, which were not supported by any finding of statistical significance, are sufficient to support a liability judgment. We believe the answer to that question is no, and we think it foreshadowed by this Court's opinion in Black v. City of Akron. In that case, this Court remarked that small samples may be a reason to hold that a Four-Fifths Rule violation does not make out a prima facie case. The case Black relied on for that proposition was Fudge, was the Fudge case out of the First Circuit. And if you look at Fudge, the sample involved in Fudge was much larger than the largest sample here. The sample of fire department hiring applicants in Fudge was 248, and here the largest sample we have is the 101 lieutenant candidates. And what Fudge said was the evidence was insufficient to show disparate impact because although there was a Four-Fifths Rule violation as to race, that violation was not supported by any evidence showing it was significant. And it said judicial significance must equate to statistical significance to control for the variable of chance and ensure that the disparities at issue were actually caused by discrimination. My understanding, and please correct me if I'm wrong, is that there was evidence that was introduced that arguably the jury relied on that showed that there was no substantive basis for the test promotion exams and the other criteria that were being used. In other words, if you start with the statistical Four-Fifths Rule and then you move on to say what did the city use to produce these results and there's no good basis for the testing, then arguably the result that the jury reached is fully supportable. Could you respond to where I'm wrong in all of that? Sure, Your Honor. I don't think you're wrong as to what they produced. We obviously disputed that evidence at the trial court level and argued to the jury that the tests were job-related and supported by business necessity. Having said that, though, I think where you're wrong in our view is making the leap from the city's failure to satisfy that element of proof as found by the jury to backfilling a finding of adverse impact on the threshold element. I would suggest to you that I believe the Fudge case actually did address the argument that if you have an exam that's really unrelated to job requirements, that in and of itself will give rise to a finding of discrimination. I believe it answered that question no. So what I would suggest is you have to look at each element individually. Here you have no statistically significant evidence of disparate impact. Frankly, otherwise what you have is a claim for testing malpractice, not a claim for discrimination. And Title VII only guarantees the absence of discrimination. It doesn't guarantee a perfect test. And so I think what is key here is to focus on the absence of any statistical significance in the disparities identified under the Four-Fifths Rule. What about the statements in the Ricci case in the Supreme Court that seem to endorse using the Four-Fifths Rule to establish a prima facie case? I'd like to raise two points about that. One, the issue is uncontested. But second, and I think even more importantly for our case, the Ricci Court didn't deal with the issue of small sample sizes at all. It wasn't raised and it wasn't mentioned in the Court's opinion. And I'm not asking you to write an opinion that goes so far as to say you can never establish a claim of disparate impact based on a Four-Fifths Rule violation. What I am asking is for you to write an opinion that says you cannot base a prima facie case on a Four-Fifths Rule violation with a small sample size. And the reason I'm asking that is it's indicated in the Code of Federal Regulations itself, 29 CFR 1607.4d, where it says that greater disparities may not give rise to a prima facie case. I'm sorry, it's addressed at federal agencies, but may not give rise to a finding of adverse impact when samples are small and not statistically significant. Now, my understanding, and again, correct me if I'm wrong, was that there was evidence from a variety of people using a variety of statistical tests after the Four-Fifths Rule was triggered, and that there's this loosely called flip-flop rule where you move one person from one group into the other group and then compare the results. So why isn't that really a fact question left for the trier of fact, whether there was statistical justification for the use of the Four-Fifths Rule in the small sample situation that's involved here? Because our view is that as a matter of law, when you have a small sample size, findings of disparities based on the Four-Fifths Rule are insufficient. What you refer to, the flip-flop, is contained in a question-and-answer guidance to the Four-Fifths Rule itself. In other words, it's not a separate test or a check on the Four-Fifths Rule. It's really part of the Four-Fifths Rule. And I think if you look at the questions and answers, the flip-flop is drawn from Question 21. What you'll find there is the regulations say, excuse me, it's not even a regulation. The guidance says. It's not subject to notice and comment. The guidance says, if you flip-flop, that's a reason to not find adverse impact. But you won't find anything in the guidance that says, take the next step, and if you can't flip-flop, that is evidence of adverse impact. And I guess what I would say on top of that is, I believe if you're going to look at the questions and answers, you have to look at the questions and answers as a whole. And part of that is looking also at the answer to Question 11. Of course, what the answer to Question 11 says is that the Four-Fifths Rule is not a legal test. It's not a legal test for discrimination. And if the submission is, well, if we look at the Four-Fifths Rule calculation, plus this manipulation that's provided in this question, and that is the only evidence of discrimination, then you're necessarily turning it into a legal test, which is exactly what the question and answers say you cannot do. So, I think when you're dealing with small sample sizes, you have to look at statistical significance. I mean, the only argument they've really raised against that is, well, these samples are so small that the statistical tests themselves aren't appropriately powered. And I would simply say that proves my point. If the samples are so small you cannot test them, then necessarily they are too small to support a finding of discrimination as opposed to chance. Are you saying that you cannot have a disparate impact violation when you have a small sample? I think there are times where samples get so small you cannot have a disparate impact violation. And I don't think that's problematic. You think this is so here? I think that's so here. I'm sorry to interrupt you, but is there a case that you would point us to that would support that statement? I don't have a case that support that statement. I think it follows from the analysis in FUDGE. Well, it follows from the analysis of FUDGE based on their theory, which you cannot rely on any other statistical test because it's inadequately powered. I don't embrace their theory that you cannot rely on any statistical test because it's inadequately powered. But if you accept their theory, then it necessarily follows from FUDGE. It follows from Fraser, which said when you have small sample sizes, you cannot support a finding of discrimination. That was out of the D.C. Circuit. So there are cases from multiple circuits that say four-fifths rule violations standing alone cannot support a finding of discrimination. And I think here the sheer randomness of the findings supports the conclusion that it was chance and not discrimination that caused the disparities. I mean, we all know the reason for disparate impact liability is to try to ferret out those practices that are seemingly benign but actually act as built-in barriers to the advancement of groups with historical discrimination in the past. And if you look at that, it's simply wrong to conclude. Common sense says that the city wouldn't have barriers against African Americans trying to be promoted to lieutenant and at the same time have barriers against Caucasians who are trying to be promoted to captain. That just doesn't work. The flaws in the way this analysis works in this case is indicative of the fact that you need statistical significance to control for the variable of chance. And if I could just briefly address the other points in my remaining time. The absence of background circumstances evidence here. There is no dispute that plaintiffs did not introduce a shred of evidence showing that the city of Akron was the unusual employer who discriminates against the majority. Is there a case that says that that is a requirement in a disparate impact case? Or aren't all of the cases that address that disparate treatment cases? They are disparate treatment cases, Your Honor. But I would submit to you that this point necessarily follows from, fits hand-in-glove with, the disparate impact theory. I mean, if the point of the disparate impact theory is, as I was saying a moment ago, to ferret out those seemingly benign practices that actually serve to perpetuate historical discrimination, what possible basis is there to have a claim for reverse disparate impact that doesn't require background evidence showing the majority was in fact subject to historical discrimination? You would be operating on an untenable assumption, which is that it is the majority, in this case Caucasians, who were operating for all these years under historical discrimination, and therefore we need to give them a disparate impact claim to ferret out that discrimination. And that simply doesn't make sense. If it's a requirement in a disparate treatment claim, it should be a requirement in a disparate impact claim. I frankly think Ward's Cove touches on this when it says the two standards should not diverge, and I don't see any reasonable basis to hold that you couldn't assert, that you couldn't, excuse me, require an element of background circumstances evidence when you have. Counsel, let me ask you a different question. What is the condition of the circumstances of the fire department today? I'm glad you brought that up. The fire department today is trying to promote, to fill the vacancies in their ranks. How many vacancies? I don't know off the top of my head, Your Honor, I apologize. This case has been going on how many years? It's been going on since 2007. Seven? 2007. Yes, Your Honor. Missed that. Since 2007? It's been going on... And you've never been able, and who represents the plaintiffs? A union? The plaintiffs are represented by, no, by private counsel. No, I mean, within the bargaining... Yeah, there's a union. What? There is a union, yes, Your Honor. There's a union? Right. And that's for the firefighters? That's correct. And are the captains still involved? The captains have been promoted. My understanding is all but one of the captains have now been promoted to district. So the only thing left are the firefighters? What's left is the permanent injunction that the court monitor is now overseeing the entirety of the promotional processes for the city of Akron. Is that just for one promotion cycle? That's not clear on the face of the order, Your Honor. Well, what I'm trying to understand is why hasn't, after all these years, the parties, the city and the firefighters and their representatives, been able to sit down and figure out a promotional scheme that's satisfactory to everybody? Your Honor, there have been discussions along those lines. We unfortunately haven't reached a conclusion that has allowed us to put all this to bed. There was an agreement, frankly, with the union to promote folks to both the lieutenant, the district chief, and I think it was either lieutenant or captain position. There was a memorandum of understanding on that. It was submitted to the court monitor for approval. The court monitor approved it, and then the district court turned around and reversed it, except as it related to district chiefs. Let me ask you a slightly different question. Is the real problem the lawyers? When you both approach a stoplight, if one says it's red, the other one will say it's green, and if the first one says it's green, the other one will say it's red, or is it the district judge that's the impediment to sitting down and finally resolving this? I'd like an honest answer, a candid answer. It seems to me from a reading of this that the district judge is as much the problem as the unions. I think that's a fair reading of it, Your Honor. Pardon? I think that's a fair reading of it, that the district judge is as much a problem, and that's frankly why we included our argument for reassignment at the end of the third brief. With that, I see my light is on. I'd like to reserve the remainder of my time. Fine. Thank you. I don't know if I need to go up or down. More than enough. Good morning. Good morning. Do you agree with your colleague that the district judge is as much the problem of getting this matter resolved as the lawyers? Your Honor, I will answer your question immediately, but I thought I was supposed to tell the clerk I would reserve five minutes for my rebuttal. Okay. Yes, you may reserve for your rebuttal. Thank you, Your Honor. All right. Your Honor, I think in large part the city of Akron has been most of the problem. Who? City of Akron, the defendant in this case. The city? Yes. Once we challenged and got a jury verdict in favor of the plaintiffs in this case, the mayor of the city of Akron at that time, who just resigned last month, stood up in meetings and told our clients, I am never going to promote any of these guys, I'm never going to do anything to resolve this, and I'll not have Akron do anything to resolve this case. And that's why promotions didn't occur. So to blame it on the plaintiffs, even Howe won. The panel in Howe won specifically found that responsibility for that went to the city, not to the plaintiffs, not even to the judge. The judge could have done things quicker. I agree. The judge could have done many things different. I agree. The city of Akron, however, wants to pick and choose. We were very upfront when we tried the case. Every testifying expert in this case, and there were four of them, all agreed that under the Uniform Guidelines on Employee Selection, a case had been made of violation of the Four-Fifths Rule with respect to every matter the jury returned a verdict on. And I think that's significant, because once the jury returns a verdict, it binds the court on similar issues. So there was a jury verdict on the race issues under state law. Counsel, may I ask you a question? Sure. That you discount entirely the argument made today with respect to why the invalidity of the use of a so-called Four-Fifths Rule in the face of a small statistical sample. You discount that completely. That has no merit, Four-Fifths Rule out of control. Let's look at it this way, Your Honor. In the Isabel case, the Four-Fifths Rule wasn't met, and this court then went and looked at other statistical measures. But, I mean, take that case since you raise it. What was the size of the statistical sampling? There were a couple hundred promotions, or at least a couple hundred applicants, and I think over a hundred promotions. Is there an amount more than here? What? You're not hearing me. I don't know why. I'm sorry. I want to make sure I hear you, and when you say something and I'm still speaking, it's not good. Right. Okay. Go ahead. Say, I wonder about the statistic sampling in the case you mentioned. You said four or five hundred. Is that quite different than here? No, I said a couple of hundred. I heard that. Yeah. It wasn't four or five hundred. A few hundred. Yes. There were a few hundred applicants. Does that make a difference? And I believe over a hundred promotions in Isabel, an issue. So what's your conclusion from that? My conclusion from that is you could find and make statistical calculations from that population that may show statistical significance. And you may not be able to do them in this instance, but it doesn't undermine the validity of using the four-fifths rule. Why not? That's precisely the argument here, that it does undermine the validity. Well, okay, I was comparing it to Isabel. In terms of this case, there's no undermining of the validity. Every expert had a chance to go through these things. Every expert agreed on at least violation of the four-fifths rule. Every argument was made by the city on all of the things that they're arguing today. One of the things they argued today is pass rates. They argued that in the district court. The jury didn't buy it. The jury said, no, the promotion rates are what's an issue. And that's what the uniform guidelines say. So talking about the uniform guidelines is much, much more than the four-fifths rule. And the uniform guidelines acknowledge it is not the be-all and end-all in terms of calculations. But we have to be mindful here that a jury considered every piece of evidence and every argument of the parties. Does there need to be some statistical evidence beyond the four-fifths rule? That's one of the points I gleaned from your opponent. This court has found in Zamlin v. Cleveland, the violation of the four-fifths rule to constitute a prima facie case. If it constitutes a prima facie case, we could literally show the four-fifths rule at rest, make them come out and put on their case as to whether the test is valid. The description of the test and testing processes for lieutenant and captain in this case have been described by the court below and even by how one, as being shoddy, as being ill-conceived, as being poor. Not one reviewing judge has ever looked at this test and said, it met the standards to meet prong two of an adverse impact analysis, which is to show that the test is a valid predictor of job performance or is sufficiently content-related to do so. They didn't meet the standard. And when it came to how the tests were scored and how the assessors worked, there were variances that were three times as large or normally permitted in statistical cases. And, yes, did you come out with great statistics? You can compute chi-squares on small numbers. And Dr. Johnson testified, yes, and they're wrong 80% of the time. Why would the test result in discrimination against African-Americans for the promotion to lieutenant and discrimination against whites for the promotion to captain? Your Honor, there was testimony at trial that the fire chief of Akron, who was the first African-American fire chief, came in and spoke to all of the assessors the night they got their training and before they started assessment. There was testimony that he said, as soon as you're done with this, this department is going to change. It will be the first big change, and the big change was going to be at the captain level. And that's exactly what happened. So I found it to be something that I can't prove the disparate treatment, but I could show the adverse impact. And so once I showed the adverse impact, it was up to the city to defend. And they did a lot of nice, fancy dancing. Dr. Jenaret came in and testified, but even he conceded on cross-examination that nobody told him about all the problems with the test. Nobody told him of the problems with the assessors. Nobody told him the problem that they pulled the test, all of the knowledge, skills, and abilities off the shelf from other places without any checking to see whether they matched and, in fact, had to come back and send new ones to the city to get people to start even doing a job analysis, which was fatally flawed. Dr. Jenaret conceded that a fatally flawed job analysis will lead to a fatally flawed test. Was it the same test that was given to the lieutenants? No, there were, in fact, two separate testing vehicles, Your Honor, and they were two separate testing vehicles in issue, and that's why the statistics that's calculated were calculated separately for each test. And as this court has said, you do not need to prove a Title VII violation with scientific certainty. It is the burden to prove disimmigration by a preponderance of the evidence. It was the jury's job and then the court's job under Title VII to enter findings consistent with the jury's verdict. And here what they're arguing is we don't like what the jury did with the evidence that was submitted. And I think that just is fundamentally an abuse of the Seventh Amendment. We should not be revisiting what a jury decided. There was nothing in what the jury did here that violated any of the instructions, that they were not instructed on. In fact, Howe 1 makes several specific findings, and I think those specific findings should be noted by this court. At page 658 of Howe 1, there's a specific finding by Judge Cole, in his opinion, saying that a promotion process was a specific employment practice, that here the process was a specific practice. You couldn't parse it down into different parts. That was consistent with the testimony of the experts at trial. Dr. Johnson, Dr. Brink, even Dr. Jacobs and Dr. Jenneret didn't talk about parsing it apart. They all looked at it as a single process. And then in addition, they argued pass rates to the court. And on pass rates, the court came out and said no. Promotion rates, citing the uniform guidelines with approval, said promotion rates are the proper metric. And that was still at page, and that's at page 659. They rejected the pass rate, saying when you do rank order promotions, you cannot merely look at pass-fail rates because they tell you nothing. And so if there's no significance in pass-fail rates, we say it tells you nothing. It didn't tell you who succeeded, who did not succeed on the test. There was also an issue we talked to the experts about clustering. Could you have no mean differences in test score and still have people clustered on the ranking sheets so that they were never reached in selection? And all the experts conceded it. They also went to argue that the city argues today that you need to have something special about this being some different employer. I say not. I say that's been disposed of in how one, specifically at page 660. The judge says this was waived. I don't know how many judges and how many people have to review it and say this is waived before they stop arguing it. So you say they've waived this argument with respect to the erroneous instruction with respect to deferring to the statistical evidence? No, I'm saying that they failed to propose any objection or any new instruction when it came to Akron having to be shown to be some unusual employer. I'm shifting to another topic. I'm sorry, Judge, I didn't move quite as fast with you. I'm just wondering, are we going to get to the city has an argument that the instruction telling the jury to defer to the statistical evidence prejudiced them? Your Honor, since they argued things from the uniform guidelines as well, and the instruction only said it was entitled to deference, it wasn't binding, it wasn't great deference, it was merely deference, and I would think that a rule that has been around for 35 years, that has been relied upon by the Supreme Court in decisions as recently as Ritchie and in fact in Lewis v. Chicago the year following Ritchie, it's cited routinely. So your argument is it was not erroneous? Oh, I said it was proper instruction. It's a proper instruction. There is no error in instructing a jury that a set of guidelines promulgated by the Department of Justice, Department of Labor, OFCCP, EEOC, OPM, and the APA, which is the Psychological Association, shouldn't be given some deference. No, no, I'm not asking about that. I think the argument is that whatever the statistical evidence was presented, maybe it was the four-fifths rule. The four-fifths rule is part of the uniform guidelines. They didn't use their own judgment that they had to accept that. I gather that's the argument. Well, then that's not what the instruction says. The instruction says you are to give the uniform guidelines deference. It doesn't say grade. It doesn't say binding. And it says, however, you must consider all of the evidence and you must decide whether they have met their burden. It doesn't end with merely that's it, you get nothing else. The city proposed and argued that their tests were great, that they did everything right. Jury found against them. And the judge under Gutzwiller v. Fenwick was bound to then issue orders that were consistent with the jury's findings. We met our burden, and the problem is you don't get a redo on it unless you show that there was something wrong. And not liking the rule, not liking what somebody did, doesn't do it. I know that Judge Cohn, when you were sitting on the circuit a few years ago, you wrote the Phillips opinion versus Phillips v. Cohen, the DFAS case out of Columbus. What? That wasn't me. I'm COHN. That was COHEN. I thought they were COHN. I could have sworn it was you, Judge. I'm COHN. I know you are. That case was COHEN. No, no, that's the defendant is COHEN. But you were the judge that wrote the opinion for the panel in the circuit in 2005. Yes. And there you wrote with approval that using the Four-Fifths Rule is proper and is sufficient to deny summary judgment. So one question is this is not summary judgment. This is a trial on the merits. Absolutely, Your Honor. So does it matter as to whether the Four-Fifths Rule is used to establish a prima facie case in the summary judgment context versus it being the only statistical evidence to support a finding of disparate impact at trial? Your Honor, I guess there are many statistical things that were testified to. Some of them were irrelevant statistics, and therefore I can't compare them. I think the Four-Fifths Rule is a statistic. It was testified to. It is not an inferential statistic. It is a descriptive statistic. But in the context of groups of promotions where you know the entire universe of applicants, you know who made the list, you know who was promoted, it becomes a powerful statistic. Was there any other statistical evidence that you presented to support your position other than the Four-Fifths Rule? In terms of supporting the inference that the firefighters who were not promoted were the victims of discrimination, we concentrated the rest of our statistics on how bad the tests were to show that even if they came forward with evidence to argue that they were job-related, that they lose. And once you meet your prima facie burden, the burden shifts in an adverse impact for the defendant to come forward and show job-relatedness, business necessity, consistent with Griggs. I also want to get away from the point. I do not want to miss the point. The defendant here is arguing that in order to win a case of adverse impact, you must meet some statistical test, some academic test of numbers. And my point is that under Griggs v. Duke Power, which gave rise to the guidelines, it was not a statistical case. Statistics or the use of adverse impact, it is a legal doctrine. It is a doctrine that is developed under law. It is not something that was developed in a lab or in a classroom. It was meant to be a practical test, and that's what the guidelines did. It was the consensus across multiple agencies, professions, and some professionals have criticized it later. But it was still very much their issue. If we could move ahead to trying to decide what happens or what is happening. So there's a permanent injunction that requires the use of the court monitor. What is the time frame of the court monitor's development of a new promotion scheme? Is that just for one set of promotions, or is that in perpetuity? My reading of the court's order, Your Honor, is that it's for one cycle. And one cycle would be promotion to district chief, promotion to captain, promotion to lieutenant. Three distinct promotions. And the cycle is for a two-year period? Once a list is developed, that list is good for two years. Under the present things, there was a test given for district chiefs. There was the dispute between what the union and the city were talking about and what the plaintiffs were talking about. Ultimately, since the city had not held promotion exams, they had all these provisional district chiefs, and so we ended up promoting district chiefs through an agreement because the promotions, whether you use the test or whether you use the agreement, would end up the same. So we didn't really require that. So the confusion that I have is that this case involves the 2004 test, which was supposed to be producing a list that was good for two years. And as I understand it, one of the many district judge orders is that the plaintiffs would be promoted, the named plaintiffs. That was done in 2011, and prior to that hearing in 2011, the city, in a pretrial, announced, we have a desperate need for promoted officers. We want a test. Had other people been promoted during that interim period, or were there just no promotions whatsoever? The history in Akron has been no promotions are made once a list expires until a new list is created. If they are, they are provisional, so you're promoted, like, for six months, and then you go back to your old rank. So there were provisional promotions, presumably, during this time frame. I'm just trying to get an understanding. Absolutely. There were provisional promotions, temporary promotions, people filling the positions that were vacant every day. What happened in this case, though, is that the city of Akron, in general, gave promotional exams about every seven years. And so if you are a firefighter and you have worked in the fire department and you feel you are wronged by a bad test, by a bad process, and you can show the impact, you want to do that. Because if you lose that promotional opportunity, you're going to be 14 years behind a cycle, so you may lose one or two promotional rounds in your entire career. And most of our clients had anywhere from 10 to 20 years of service already in the fire department. Does that answer your question? I'm getting there, yeah. So I'm curious. Another issue that's raised in the briefs has to do with the back pay and when it starts. And the argument that's made by the other side is that, in a sense, you're being contradictory in saying that the back pay should start before the date that you use for satisfying the statute of limitations. How do you respond to that? What the court below did and what the defendant is defending here is using the date the list expired as the first date of back pay. Which is 2007. Which is 2007. Every selection from those lists was made in 2005 except two. So all of the promotions that we believe are found illegal by the jury's Therefore, we looked at this court's law on EEOC versus Monarch Machine Company, and in Monarch Machine it said you go to the first transaction. And Title VII recognizes that in its structure. But if you are using the 2007 date for statute of limitations purposes... We filed charges in 2005, so, I mean, we're not using it for statute of limitations. So you were not for the filing of the complaint? The filing of the complaint was 2006. It was filed before the list ever expired. Okay. The case was tried in 2008, the year after the list expired. So your answer to my question then is that there is no conflict because you never used 2007 as the critical date. We did not, Your Honor. The only thing that happened in 2007 is the list expired. And we believe consistent with United States v. City of Warren, you go back to the date of the hiring decision that you're in issue to get your back pay started. Title VII of the Civil Rights Act in Section 706G provides that you may not go back more than two years prior to a charge of discrimination in granting back pay because they anticipate you're not going to file your charge until the back pay is already running. And so here, the charges that this case was based on were filed in 2005. We think there's no problem going to the first date of promotion, which is April of 2005. Your Honor, in terms of the other issues in back pay, when the judge promoted the people and he said you should have been promoted, even he said you should have been promoted in 2007. Well, in 2011, he promoted them to the entry-level pay step. So they went back 16% in pay and had to go back two years to get that back. If you started back pay in 2007, even, you would have done those first two steps in 2007 and 2008. By 2009, you're at the full pay rate. So that's your argument in terms of why there should be a reversal and remand for a new trial on damages? Well, I think with instructions from this court, because what happened if you read Judge Gilman's concurrence and what we call how-to, which is the sanctions appeal that was dismissed, but Judge Gilman said back pay here should be pretty simple. You get the payroll records, you know who was paid what, you get the pay rates, you compute it out. That's exactly what Brad Carr did on a spreadsheet. And even though the court in September of 2014 vacated the monetary sanctions that he had leveled against myself and my co-counsel, the judge turned around and didn't vacate any of the evidentiary sanctions against our clients. And those evidentiary sanctions cost them probably several hundred thousand dollars in computations, especially if we got to go back to 2005. Your Honor, I know my time is getting short. I've reviewed, I've reserved some. I don't know if there's a specific question somebody has, but I'm more than happy to answer them. I have every confidence that this court must respect what a jury did and what they decided to believe and what they didn't decide to believe. There's nothing here that complains about the basic instructions to the jury on the issues. If the complaint is about the use of the word deference in one instruction, taken as a whole, the instructions do not give any notion that the jury could not listen to everything else that was put in, that they couldn't make their decisions independently. And so we would ask this court to affirm the findings and reverse the issue related to back pay and send it back to the court, and I reserve for rebuttal. Thank you, Your Honor. Your Honor, I'd like to begin, if I may, by trying to clear up the confusion over where we stand, and then I'll transition into making some other points. Where we stand is, as of 2011, all lieutenant and captain candidates still in the city's employ, and there were 18 total, 11 captains and 7 lieutenants were promoted. That was the promotion that was reviewed in Howe 1, which we talked about earlier. Where we now stand is we are under a permanent injunction that forbids the city from using any exam that in any way causes a disparate impact as to any protected group for the foreseeable future. And I appreciate the concession on the other side that it should be limited to one cycle of exams, but I don't see that language anywhere in the order, and I would submit at a bare minimum, if this court does nothing else, it should make clear that this ends after one cycle of exams. When will the exam be? I mean, I can't understand what you're saying, that where does the city stand? I should have said one cycle. Are we having no exams and we haven't had for years and years? So here's where we are. I spoke earlier of a memorandum of... Answer to that. Has there been an exam? When's the last time? There was an exam in February as two lieutenants. As two lieutenants. When's the last time for captains? I don't think there's been a captains exam since the exams at issue in this case. And the one in February for lieutenants was pursuant to the court monitors running the show? That's correct. And just to close out the loop on that, Judges Cook and Moore, there was a memorandum of understanding I referred to earlier. That actually covered three positions, district chief, captain, and lieutenant, and what happened with that was the memorandum of understanding resulted in immediate promotions to district chief. The other two were rejected by the district court, and so we're in a phase where we have to go through the process with the court monitor as to lieutenant and captain. And if you think about it and you ask yourself what the court monitor is supposed to do, that, quite frankly, is part of our difficulty with the disparate impact and reverse disparate impact findings. All the court monitor can do at this point is look at pass rates, look at standard deviations of scores, and look at mean scores to try to determine whether discrimination exists. And, of course, all those tests were done with respect to the 2004 promotional exams, and all of those tests passed in the sense that there was no significant disparity due to race or age. So under the rule of law adopted by the district court, what the court monitor will have to do is monitor the actual promotions for two years, regardless of whether the tests themselves created no disparities. And there really, as we see it, are only two options. One is the court monitor could stop promotions when every protected group, because, remember, another flaw with this injunction is it's not limited to race or age, when every protected group is balanced under the Four-Fifths Rule. Or, at the expiration of the two years, it could overpromote to try to bring everybody into balance. Neither solution is tenable. It involves skipping over qualified applicants who have worked hard and deserve a promotion, and it involves a safety force that is either understaffed or overstaffed. Anything that the monitor does can, I take it, both parties can object to or make arguments? That's correct, Your Honor. Okay. So what's the actual gripe? Is it the fees? The actual gripe is with the fees and with the scope. The permanent injunction should be limited, we believe, to the classes at issue and the positions at issue, not the entire promotional process. I mean, the other problem, you're exactly right, there are tons of fees, fees for experts for both sides in the court, court's own expert, fees for both sides' attorneys, fees for the court monitor themselves. And all of this, and I didn't get a chance to mention this earlier, but all of this is based on speculation, not an actual finding of ongoing harm as to any particular plaintiff. If you look at the district court's order and you drill down, you'll notice that the only reason he gives for issuing this broad permanent injunction is he doesn't know. He doesn't know whether certain plaintiffs are entitled to additional time and grade. Well, if that's the question, then A, there should have been findings that answered that question, and B, any further relief, because remember, these people were already promoted and got back pay. There should have been findings where? He should have made findings before issuing a permanent injunction. What I'm saying is you can't raise a question, and by raising a question, issue a permanent injunction. So if there were findings, there should have been findings in the permanent injunction order that specific plaintiffs have been harmed by not having additional time and grade, and any relief should have been limited to granting those specific individuals additional time and grade. He took a sledgehammer to the entire promotional process at every level of the fire division to attempt to address a discrete issue that he hadn't even himself resolved, and that's fundamentally wrong. Well, couldn't the district judge hypothetically at least say, there have been these problems with respect to the 2004 promotion process, and I'm concerned about the animosity between the two sides, and concerned about retaliation against individuals, and therefore there needs to be some kind of a neutral, the court monitor, who will be overseeing what goes on at least for the next cycle, and that's in part because the jury found that the testing process used in 2004 was not properly evidence-based. So arguably there could be some legitimate basis for what the district judge was doing. The really sad thing about this situation is how much time and anguish and money has been spent when you would think everybody wants there to be fair promotion processes in the fire department in this city. I agree. I mean, reading all of these documents and such makes one really feel so sad about what has happened. I don't disagree with that. I mean, I think everybody does want a fair process. I think, you know, if you look at this, the city had already moved on from the consultant that did the 2004 test. That consultant left years ago, and I guess a general anti-retaliation provision, while you can make arguments that we don't need to obey the law provisions, I wouldn't have a problem with. I see my light is on. Sure. So my issue, though, is with putting a monitor in charge of the promotional processes. And I guess what I would ask you to do when you're thinking about that is draw a contrast between this case and the U.S. v. City of New York case, which is the authority the district court relied on. And what you'll notice there is that the court said that injunctively that, excuse me, putting the monitor in place was warranted not because solely of a disparate impact finding, but because of the historical discrimination that had existed in that case. The court went back and noticed findings dating back to 1973 of disparate impact within the fire division and the city's reluctance to take any steps to fix it. Now, here we already had a new testing consultant in place who the city had every confidence was going to develop a new and better examination, and there was no history. There simply was no history of discrimination. And I think because of those two points, at a minimum, the permanent injunction should be vacated and the court monitor should be removed. Thank you. Initially, the February testing included lieutenants and district chiefs. That's one thing the court should know. And the people that were promoted to district chief ultimately were promoted with agreement of plaintiff's counsel. It wasn't just the union and the city entering into some agreement. Plaintiff's counsel agreed because we wanted to see people get promoted. The promotion that was initially proposed by the union and the city would have bypassed five out of the seven working captains going to district chief who would have bypassed six out of the seven lieutenants who are plaintiffs who were promoted. And so that's why we opposed it before the court, because it put our people last in line, and we thought that that was wrong. I agree that in many respects it is sad what has happened here, but in part what has happened here, there is a lieutenant's list that is out now that they're promoting off of. At least I think they're promoting. I know there's a list. There's a capstan test in development, and it's my understanding from reading the court's injunctive order that once that third in, it really is not to monitor adverse impact. I didn't see that in the court's order. His order is to develop nondiscriminatory tests that satisfy all of the metrics of coming up with a fair test, and I think that was because the court was struck during the trial with how bad a job had been done in these two tests and therefore needed to be done. City of New York case is different. That monitor or special master that's been appointed to the City of New York case has a massive job to do that'll be going on for years and years. I expect that once a captain's test is given and a list is created, that David Cohen, as the court monitor in this case, will be done with his work, and we will have completed the cycle. With respect to... I don't see... You don't disagree that there wasn't a historical grounding for what the district court did,  of how poorly the testing was accomplished without... You think it was egregiously bad. It was so bad that I think the judge had every right to say... That's your best argument for having the monitor in place, and New York, it was historic discrimination. The authority of a judge to appoint a special master or somebody with special master-type powers to oversee a process to implement something he isn't joining I think is entirely proper and has been done repeatedly by courts in this country. I don't think that we have... The judge didn't use a sledgehammer in the decree. He said one cycle. I know that it says it's a permanent injunction, but the permanent injunction, in terms of what's going to happen under it, is going to be finished, hopefully, this year. And my clients just didn't want to be the people left at the bottom of the list when promotions came up. They wanted an opportunity to compete fairly for the next round. I still have lieutenant clients that are seeking promotion to captain. I want to make sure that they're treated right. And I think I have a right to do that in light of what the court ordered, and I don't think the monitor will do anything different. I don't believe that this court should do anything to disturb the verdicts, disturb the findings of liability. I think what this court should do, if anything, is send it back with very, very good instructions as to what the judge should do with back pay and to vacate the evidentiary sanctions that were entered against my clients in the retrial in July of 2011. And I thank the court for its time. If there's anything else you want, I see I have a little bit left, but I think we've spoken a lot about it today. Thank you very much. Thank you both for your argument. The case will be submitted with the clerk adjourned.